## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 7 |
| Oaktree Medical Centre, PC, | ) | |
| | ) | Case No. 19-05155-hb |
| Debtor. | ) | |
| _____ | ) | |
| | | |
| John K. Fort, Trustee, | ) | |
| | ) | **AMENDED COMPLAINT** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No.: 21-80057-hb |
| | ) | |
| Aaron Kibbey, individually and as Chief | ) | |
| Restructuring Officer of Oaktree Medical | ) | |
| Centre, PC; Timothy Daileader, | ) | |
| individually and as Independent Director of | ) | |
| Oaktree Medical Centre, PC; Huron | ) | |
| Consulting Services, LLC aka Huron | ) | |
| Consulting Group; Mark Freedlander; | ) | |
| David Pivnick; and McGuireWoods LLP, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

John K. Fort, Chapter 7 Trustee of the bankruptcy estate of Oaktree Medical Centre, PC, by and through his undersigned attorneys, hereby states as follows:

### NATURE AND BASIS OF ACTION

This Action arises out of Defendants' engagements as third-party officers, restructuring consultants, and professionals for the Debtor and two sister entities that are companion cases hereto and any proofs of claim filed by them or their related entities. During their tenure, they succeeded only in paying themselves and substantially increasing the Debtor's unsecured debt, for which they are liable. Defendants' actions constitute breaches of their fiduciary duties and gross negligence, and make them liable for violation of various other statutory and common law causes of action as detailed below.

The Defendants were hired to fix a healthcare conglomerate that was failing to pay its debt on a credit facility secured by, among other things, the lender's ability to place turnaround professionals into critical management positions. Over the course of approximately one year, and while with complete financial, operational, and fiduciary control, the Defendants made no attempt to coordinate a sale or refinance of the Debtors and did not even begin a corporate restructuring. As the Debtors' assets were quickly depleted and the liabilities grew, the Defendants collected professional fees totaling nearly $5 million. Once there were no more funds to pay those fees, and with no concern for the unsecured creditors to whom the Defendants owed a fiduciary duty, they filed the herein Chapter 7 Petitions.

### PARTIES AND JURISDICTION

1.      On September 19, 2019, Oaktree Medical Centre, LLC; Oaktree Medical Centre, PC; and Labsource, LLC filed petitions for relief under Chapter 7 of the United States Bankruptcy Code in the Western District of North Carolina. On or about October 1, 2019, the Chapter 7 cases were transferred to the United States Bankruptcy Court for the District of South Carolina, and, on October 2, 2019, John K. Fort (hereinafter "Plaintiff") was appointed as duly qualified and acting Chapter 7 Trustee for all three Debtors (hereinafter collectively the "Estate").

2.      Oaktree Medical Centre, PC is the Debtor in the above-referenced Chapter 7 bankruptcy case. Oaktree Medical Centre, PC is a South Carolina company whose principal place of business was in Easley, South Carolina before it ceased doing business.

3.      Upon information and belief, Aaron Kibbey is a resident of the State of Illinois but was engaged by and did business for the Debtor in South Carolina.

4.      Upon information and belief, Timothy Daileader is a resident of the State of New York but was engaged by and did business for the Debtor in South Carolina.

5.      Upon information and belief, Huron Consulting Services, LLC aka Huron Consulting Group (hereinafter "Huron") is a limited liability company organized and existing under the laws of one of the states of the United States of America and doing business in Greenville, South Carolina.

6.      Upon information and belief, Mark Freedlander is a resident of the State of Pennsylvania but was engaged by and did business for the Debtor in South Carolina.

7.      Upon information and belief, David Pivnick is a resident of the State of Illinois but was engaged by and did business for the Debtor in South Carolina.

8.      Upon information and belief, McGuireWoods LLP (hereinafter "McGuireWoods" or "Lawyers") is a limited liability partnership organized and existing under the laws of one of the states of the United States of America and doing business in Greenville, South Carolina.

9.      This adversary proceeding arises under Title 11 (11 U.S.C. § 101 *et seq.*) (the "Bankruptcy Code") or arises in or relates to the Chapter 7 bankruptcy cases of Oaktree Medical Centre, LLC, Case No. 19-05154; Oaktree Medical Centre, PC, Case No. 19-05155; and Labsource, LLC, Case No. 19-05161, all now pending in this Court (and all three Debtors are hereinafter collectively referred to as "OMC" or "Debtors").

10.     This Court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C. §§ 329, 544, 547, 548, and 550; 28 U.S.C. § 1334; S.C. Code Ann. § 33-8-300; and S.C. Code Ann. § 39-5-10.

11.     This is a core proceeding under 28 U.S.C. § 157(b)(2). To the extent Article III of the United States Constitution does not permit any cause of action asserted herein to be treated as "core," Plaintiff consents to the Court entering final orders or judgment pursuant to 28 U.S.C. § 157(c)(2).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

**A.     The Formation of Oaktree Medical Centre**

13.     OMC was a pain management practice privately owned by a non-practicing chiropractor, Daniel McCollum. OMC was operated out of between thirteen and sixteen clinics across South Carolina, North Carolina, and Tennessee with a base of approximately forty providers that generally rotated between several locations.

14.     The iteration of OMC for these purposes was formed in 2014 with a merger between existing Pain Management Association clinic locations and FirstChoice Healthcare. OMC acquired multiple Tennessee practices in 2016. (OMC, FirstChoice Healthcare, and the Tennessee practices are collectively referred to as "OMC.") OMC's patients were primarily sourced from referring physicians who did not incorporate pain management into their practices.

15.     OMC also had a compounding pharmacy and (at one time up to) three toxicology lab operations, including an independent reference lab, Labsource. As of May 2019, there were approximately 380 employees throughout the enterprise. In 2018, patient-general visits totaled approximately 203,035 and approximately 24,125 interventional procedures were conducted across the clinical network.

16.     Labsource provided physicians and healthcare providers with comprehensive toxicology reporting at clinically relevant testing levels utilizing its proprietary High Sensitivity Definitive Testing Methodologies. In 2018, approximately 47% of lab sample receipts collected came from OMC's clinics located in North and South Carolina, 12% from the Tennessee Clinics and the balance from third-party sources. In 2018, Labsource processed approximately 92,413 samples in total.

B.     **The Fidus Loan**

17.     On May 6, 2014, Fidus Investment Corporation and West Family Investments (collectively the "Lenders") provided OMC with a $14.0 million senior secured credit facility to finance OMC's acquisition of FirstChoice Healthcare (the "Investment Agreement"). This transaction resulted in OMC becoming what was considered the largest independent provider of pain management healthcare services in the state of South Carolina.

18.     In 2016, Daniel McCollum became a guarantor on the loan and in 2017, he pledged approximately $10 million in personal assets as collateral for the loan. Around this time, OMC violated a covenant in the Investment Agreement by spending approximately $6.0 million to start Labsource without the Lenders' consent. Consequently, the Lenders issued a reservation of rights letter, added Labsource as a borrower to the Investment Agreement, and issued a forbearance. OMC continued to borrow under the revised loan provisions.

19.     Ultimately, however, as a result of OMC's inability to repay the Lenders' $18.4 million in loans and $1.769 million of historical fees on the maturity date, the Lenders issued another reservation of rights in early 2018.

C.     **OMC Operation and Control: Tim Daileader's Placement**

20.     Following the inability of OMC and the Lenders to reach an agreement on the terms of a waiver and amendment, on July 12, 2018, the Lenders exercised one of their remedies and terminated all rights of the sole member and shareholder of OMC, Daniel McCollum, to exercise control over OMC, including Labsource.

21.     The Lenders directed Dr. McCollum to refrain from exercising the voting and other consensual rights relating to those units and reserved those rights for the Lenders in their capacity as collateral agent.

22.     The Lenders contemporaneously appointed Mr. Tim Daileader as an Independent Director/Manager at Oaktree Medical Centre, PC and Labsource, LLC and vested Mr. Daileader with corporate authority and control over all day-to-day management, financials, and operations of OMC.[1]

23.     This was Mr. Daileader's first independent directorship in a healthcare company.

24.     Mr. Daileader authored a letter, dated May 16, 2019, to the United States Department of Justice ("USDOJ"), which accompanied OMC's inability to pay applications, alleging OMC could not pay the legal costs to defend a number of qui tam lawsuits against it which the USDOJ had joined (the "DOJ Letter"). This, **Exhibit A**, attached hereto, and all other exhibits herein, are incorporated by reference, the same as if fully set forth in this Complaint.

25.     In the DOJ Letter, Mr. Daileader wrote: "The Oaktree Medical family of entities have been subject to varying degrees of financial distress for several years.  This financial distress is exemplified by, among other things, a failure to timely pay withholding tax obligations and an inability to pay secured lenders upon maturity of the credit facility.  Soon after becoming an independent director of Oaktree Medical Centre, P.C. and Labsource, LLC, it became readily apparent to me that the financial circumstances of these companies resulted largely from a lack of qualified management and oversight."[2]

---

[1] Under the terms of the Unanimous Written Consents of the sole stockholder of the companies, the Lenders enacted their powers under the stock pledge as follows: 1) Oaktree PC formed a Board of Directors and elected a single director, Tim Daileader. Daniel McCollum remained the single member, but all corporate authority was transferred to the Board. This was effective July 12, 2018. 2) Labsource elected that it was to be managed by a Manager, Tim Daileader, and not the Member, Daniel McCollum. Consequently, all corporate authority was transferred to the Manager from the Member. This was effective July 12, 2018. 3) Oaktree LLC removed Daniel McCollum as a manager and retained Tim Daileader as the sole manager, and all corporate authority was retained by the manager. This was effective June 20, 2019. In sum, Mr. Daileader was given all corporate authority and control of OMC, including Labsource.

[2] The OMC financials as of July 31, 2018 were as follows: Year to date net revenue of $27,068,938; year to date net income of $1,875,047; total assets, excluding goodwill, of $11,756,609; and total liabilities of $27,370,705.

D.      **Huron and McGuireWoods Engagements**

26.      In mid-July 2018, Mark Freedlander, an attorney with McGuireWoods, ran into an old acquaintance, John DiDonato, head of Huron's restructuring group, at the gym. Mr. DiDonato told Mr. Freedlander that he was involved with a matter in Charlotte, North Carolina that "had the potential to get nasty in short order." This information was relayed from Mr. Freedlander to Scott Vaughn, an attorney in McGuireWoods' restructuring group in Charlotte, in an email. See **Exhibit B**.

27.      Mr. Freedlander urged Mr. DiDonato to get McGuireWoods and Mr. Vaughn involved. See **Exhibit C**.

28.      By July 18, 2018, Mr. Freedlander had connected with Mr. Daileader and a McGuireWoods team member had drafted a form letter for Mr. Daileader's signature terminating the engagement of OMC's prior counsel. See **Exhibit D**.

29.      As of late July, Mr. Daileader, Mr. Freedlander, and Mr. DiDonato were still attempting to coordinate their engagements. Mr. Freedlander wrote in an email to Mr. Daileader and Mr. DiDonato that McGuireWoods was "pressing to become overall transactional counsel [for OMC] in light of the MSO structure." See **Exhibit E**.

30.      Upon information and belief, Mr. Freedlander had no experience with a management services organization ("MSO")[3] and had already been soliciting advice from a McGuireWoods attorney who did. See **Exhibit F**.

31. In the same email, Exhibit E, that Mr. Freedlander wrote to Mr. Daileader and Mr. DiDonato regarding the MSO, Mr. Freedlander noted to Mr. Daileader: "I appreciate your concerns about conflict but if the lenders are paid in full as a result of the transaction, then these conflicts don't matter."

---

[3] See (G), infra.

32.    Ultimately, and ignoring any potential conflicts, Mr. Daileader required Dr. McCollum and OMC to retain Huron, which included Huron Transaction Advisory ("HTA")[4] and the McGuireWoods law firm, purportedly to assist with the corporate restructuring necessary to refinance the Loan.

33.    Mr. Daileader convinced OMC management and Dr. McCollum's local counsel that he needed McGuireWoods' representation for the sale of the company and, as he wrote in an email, their "corporate lawyering gets [McCollum] a better deal, higher price, etc." See **Exhibit G**.

34.    On or about July 25, 2018, Dr. McCollum and OMC management informed Mr. Daileader and Mark Freedlander that OMC was signing a non-binding, exclusive Letter of Intent ("LOI") with National Spine and Pain Centers Holdings, LLC ("National Spine") through which all OMC businesses except Labsource would be sold for a proposed purchase price of $75 million. The proposed sale process was contemplated to take 90 days or less, subject to any mutual agreement to extend.

35.    McGuireWoods' primary sales pitch for its engagement indicated that it had a deep healthcare and mergers & acquisitions practice with broad experience in transactions similar to the potential sale to National Spine. This was relayed in an email from Mr. Vaughn to Grady Jordan, Dr. McCollum's personal lawyer. See **Exhibit H**.

36.    However, Dr. McCollum and OMC management exclusively negotiated with National Spine during the pendency of the LOI, which left Mr. Daileader, HTA, Huron, and McGuireWoods on the sidelines.

---

[4] According to its own marketing materials, HTA is the investment banking affiliate of Huron. HTA provides capital advisory services to both healthy and distressed companies, including M&A advisory, capital raising, balance sheet restructuring, and other related services. Huron provides comprehensive solutions to companies in transition, creditor constituencies, and other stakeholders in connection with out-of-court restructurings and bankruptcy proceedings to maximize sustainable value. They provide an in-depth analysis of a company's strengths and weaknesses and assist with the development of a clear strategy for moving forward.

37.    According to the DOJ Letter, HTA's participation was held in abeyance during this time and it "was not ultimately engaged until October 2018, when it became evident that the 90-day transaction timeline with National Spine would not be sufficient and the closing of the anticipated sale transaction became less certain."

38.    HTA was brought in, according to Mr. Daileader, "under an engagement to refinance [OMC's] obligations to the Lenders and conduct the necessary underwriting due diligence. The refinancing was to be conducted in parallel with the National Spine sale process, with a process targeted completion at or near the end of calendar-year 2018."

39.    On October 3, 2018, OMC, through Mr. Daileader, retained HTA pursuant to an Engagement Agreement that required a non-refundable $250,000 retainer fee in order to, according to the terms of its engagement, assist OMC in executing a Debt Financing Transaction by identifying, presenting to, and negotiating with potential capital providers. See **Exhibit I and Exhibit O**. Huron and related companies failed to perform their responsibilities under these agreements and under industry expectations and standards causing damage to the debtor and its creditors and, accordingly, Huron and its related companies are not entitled to payment as called for in their proofs of claim filed February 7, 2020,[5] or any other claim filed by Huron.

40.    Upon information and belief, Mr. Daileader was intent on making sure that the National Spine deal failed so he and Huron could put themselves firmly in place. In an October 24, 2018 email he wrote: "1. We need to show some backbone and that we're willing to say no to [National Spine]. Otherwise, they will try to buy these assets through a 363 sale. They actually need the assets, but [Daniel McCollum] is right – they don't think there's a floor on price. 2. The

---

[5] Claims 18-1, 19-1, 20-1 in case 7:19-05154; Claims 57-1, 63-1, 75-1; and Claims 22-1, 23-1, 24-1 in case 7:19-05161.

LOI is a distraction to Brohm and Webb[6] — they're trying to force a deal that isn't there — and they are succeeding at delaying [Daniel McCollum]'s proceeding with Huron. We need to shift the strategy definitively, or else we're going to lose the last window we have." See **Exhibit J**.

41.    It was during this correspondence that Mr. Daileader posed the following to Mr. Freedlander: "I have a serious question in mind – if the LOI is invalid and there is no Huron IB[7] letter, then the Company is truly insolvent. And that asks should we be preparing a bankruptcy filing before the estate deteriorates further."

**E.    The Raids**

42.    Mr. Daileader did not have to think about the National Spine LOI for long because his wish for the potential purchase to fail came true just six days later. According to the DOJ Letter: "On October 30, 2018, the FBI, Drug Enforcement Administration and US Department of Health and Human Services conducted raids on the Easley, Spartanburg, and Greenville OMC facilities. At that time, the refinancing effort was terminated[8], the National Spine LOI terminated without extension, and [OMC] sought to revise the role of Huron to include engagement of a Chief Restructuring Officer ('CRO'). Likewise, the retention of McGuireWoods was correspondingly expanded to provide for restructuring, corporate and healthcare legal services to the entire enterprise."[9]

43.    The day after the raids, Mr. Daileader expressed in an email that the sale of the business or refinancing was impossible, and if "the mess" wasn't cleaned up, OMC would be in

---

[6] Michael Brohm was OMC's CEO and David Webb was its CFO.

[7] "Investment Banker"

[8] By Mr. Daileader.

[9] HTA kept the entirety of its $250,000 retainer for its limited due diligence work. Once this role changed to Huron, HTA pocketed the fee and Huron began billing OMC hourly.

default with the Lenders. Mr. Daileader also stated that the Lenders would not wait very long, and that "the mess" likely would not be cleared up any time soon. See **Exhibit K**.

44.     At this point, according to an email, Mr. Daileader put the Debt Financing Transaction on hold "until the business was stabilized." The scope to do so, according to Mr. Daileader, included "oversight of the business and operations of the companies, including focus on cost control, revenue generation, and cash flow stability; cash management of the entire group (there is the thought that all companies will become borrowers or guarantors to the credit facility as part of any lender forbearance); management of existing professionals who will be placed in a subordinate role to the CRO's role; interface with the lenders; and repair and implementation of the strategy to refinance or sell the Companies." See **Exhibit L**.

45.     Despite this change of course, Mr. Daileader kept Mr. Freedlander, who was not in McGuireWoods' healthcare practice group, as his and Huron's main attorney contact, with only minimal input from the McGuireWoods healthcare team until the following spring. From the beginning, according to an email, Mr. Freedlander knew that the situation was a mess, but would create an opportunity for considerable revenue for the Lawyers, including himself, so he was eager to get on board and stay on board. See **Exhibit M**.

**F.    Aaron Kibbey**

46.     On or about November 9, 2018, Mr. Daileader placed a Huron employee named Aaron Kibbey in the role of MSO-level CRO of OMC.

47.     According to a July 2018 marketing pitch to OMC, Huron touted itself as "one of the largest and most experienced Healthcare and Financial Consulting firms in the country. Huron maintains unparalleled Healthcare and Financial Advisory experience. Our healthcare capabilities and experience include: More than 500 physician organizations, 100 post-acute and rehabilitation facilities, 450 hospitals and 100 life sciences clients; [o]ver 1,200 dedicated,

industry focused professionals with broad expertise; [n]umerous restructuring, business assessment, performance improvement, strategic, interim management and transaction assignments; [and that additionally] [w]e know the business, payers, market dynamics and the customers (e.g., patients and physicians)." See **Exhibit N**.

48.     While CROs typically have an expertise in the field of business in which the company operates, this was, inexplicably, Mr. Kibbey's first engagement as a CRO with Huron and his first and only engagement as a CRO for a healthcare company.[10]

49.     This inexperience was evident in Mr. Kibbey's Rule 2004 Exam testimony, conducted on September 10, 2020:

> A. I think I've said this before. I'm not a healthcare corporate structure expert. I spent a lot of time looking at the way that all of the entities were set up. I did not understand – I understood it better as time went on and as McGuireWoods explained to me how it should be set up versus how it was set up, but I don't know if I would say I ever completely understood the structure.

50. Mr. Kibbey further testified:

> Q. Was it possible to reorganize Oaktree without a clear understanding of the corporate structure?
> A. With the guidance and counsel of McGuireWoods healthcare team, yes.

**G.     The MSO**

51.     An MSO generally refers to a health care specific administrative and management engine that provides a host of non-clinical administrative and practice management functions to a medical practice. MSOs are generally necessary to be successful in the ever-changing healthcare environment because they enable the practice to have better control over overall medical spending and cost effectiveness.

---

[10] As detailed below, Huron would not engage their healthcare practice team until June 2019.

52.     The decision to build MSO services should be inclusive to an overall strategy to gain market share, increase revenue, improve profitability on business risk, and/or fill a need for a central infrastructure to manage administrative services. A primary advantage of an MSO is to have access to management services and to ensure the lowest prices on supplies and services. MSOs obtain economies of scale that allow them to obtain preferred pricing from medical suppliers to healthcare insurance.

53.     Critical components of an MSO centralize the administrative and management functions of health practices to leverage resources efficiently and allow providers to focus on providing quality clinical care to patients. Centrally managing or prescribing minimum standards for delegation to partners for services like care management or the provision of clinical guidelines allows MSOs to standardize services across a health system. One of the purposes is to find "at risk" or non-compliant billing practices and recommend corrective action plans and best practices for compliance to meet regulatory requirements or billing guidelines.

54.     Under the terms of the November 9, 2018 Engagement Letter, Aaron Kibbey was to serve as the MSO's CRO and report to the MSO Board. His responsibilities were extensive and included: Managing the MSO executive team; overseeing and monitoring cash receipts and disbursements as set forth in Board approved budgets including reviewing and approving release of payments; implementation of Board approved plans and initiatives; coordinating with the CEO and CFO of the MSO to develop a 2019 budget, rolling 13-week and longer-term weekly cash flow forecast; analyzing the financial operating performance, working capital assets (e.g. cash, accounts receivables and other) and liabilities of the MSO and MSO managed entities subject to any service agreements that are in place; coordinating with the retained investment banker for the development of a confidential information memorandum ("CIM") for either a refinancing or sales transaction and ongoing assistance and support with negotiations with the prospective purchaser

under an existing letter of intent ("LOI") or prospective LOI; coordinating with Dr. McCollum and the CEO of the MSO for communications with Combined Organization physicians, mid-level providers and staff; assisting MSO Board in retaining and coordinating with legal counsel and other professionals related to assessing and implementing corporate and operational compliance programs; continuing implementation of Owner entity payments and compliance with tax settlement agreements with the IRS and state authorities; reviewing revenue cycle processes and practices, including retaining experienced professionals to assist with a review of the processes and practices in all businesses subject to management service agreements provided by the MSO; overseeing completion of the audit of the financial statements of Owner entities for the annual period ended December 31, 2017 and compilation of the financial statements for the most-recent available year to date period in 2018, including review of internal controls over the financial reporting processes; [and] analyzing commercial activities of the MSO and those entities subject to MSO management service agreements, in order to assess the current situation and make and implement Board approved actions to stabilize and enhance operations. See **Exhibit O**.

55.     As early as August 2018, Mr. Daileader and Mr. Freedlander knew that OMC's MSO provisions were not fully implemented, functional, or in full compliance with federal, state, and local laws. See **Exhibit P**.

56.     In an email dated October 12, 2018 to Mr. Daileader, Mr. Freedlander stated that it was far from clear what portions, if any, of the MSO structure were in place, which ones were not, and why. Consequently, Mr. Freedlander made sure that Huron was appointed "at the MSO level." See **Exhibit Q**.

57.     Despite what appeared to be a clear consensus for an MSO placement, when Mr. Kibbey was questioned about this at his 2004 Exam, he testified as follows:

Q. Was Huron hired as an MSO-level CRO?

> A. I don't understand the question.
> Q. Do you know if Huron was hired as an MSO-level CRO?
> A. I'm not sure I understand. Are you asking were we the CRO of OMC, LLC?
> Q. I'm asking if you understand the phrase "Huron was hired as an MSO-level CRO?"
> A. I don't understand the question.
> Q. Do you know what it means to be an MSO-level CRO?
> A. I have never heard that term before.

Mr. Kibbey's testimony at the November 4, 2019 341 Meeting is also illustrative:

> Q. Okay, and [OMC] PC's goal was to do what, then?
> A. So, I think they were – it was supposed to be structured, and I don't claim to be a medical corporate entity structure expert, we deferred – we had an entire team from McGuireWoods that was looking into that, and I think the way it was supposed to be structured so that you separate the clinical assets, if you will, from the non-clinical assets. Unfortunately, that was never done.
> Q. Never done before you became involved or?
> A. Correct and since. There was a plan to do it. There was a lot of time that went into what would be required in terms of the paperwork to change the entire corporate structure. I think part of that just due to a number of issues including liabilities associated with those entities, was going to be done through a Chapter 11 restructuring as well. So, there was a plan in place to do all that, but it never happened.

**H.    Problems with Huron**

58.    Given Mr. Kibbey's lack of healthcare experience, his ignorance of the subject would not be surprising but for the fact that at the time of the 341 Meeting he had just recently completed his duties as the CRO of OMC, a healthcare company, after nearly a year.

59.    As early as November 5, 2018, according to an email, Mr. Daileader and Mr. Freedlander were already having issues with Huron's "stagnation," and soon after came issues with their billing practices. Mr. Daileader and Mr. Freedlander were upset about Huron's hours and lack of any detailed invoicing as to what services Huron actually performed. See **Exhibit R**.

60.    Mr. Freedlander remarked in one email in November 2018, "None of us look very good at the moment here and we need to rectify this very quickly before the bottom falls out." See **Exhibit S**.

61.    Similar frustrations continued throughout Huron's engagement, and their incompetence was often evident.

62.    Mr. Daileader received negative feedback from the Lenders in January regarding Huron's performance, particularly with regard to Mr. Kibbey. See **Exhibit T**.

63.    In February, Mr. Freedlander voiced his concern regarding a lack of CRO leadership to his McGuireWoods colleagues, as well as separately to Mr. Daileader. He wrote in an email: "Huron has been less than efficient and effective." See **Exhibit U**.

64.    By April, according to an email, the Lenders continued to be critical of Huron due to their inability to drive the restructuring process forward. See **Exhibit V**.

65.    OMC management discussed their concerns with Mr. Daileader, who, according to an email, confirmed even to them that he was not impressed with Huron's involvement. See **Exhibit W**.

66.    When pressed about substantially decreasing or even discontinuing Huron's involvement, Mr. Daileader admitted, according to an email, that he was looking into replacements. Nevertheless, Huron remained and the ineptitude and resulting contractual and professional breaches of duty continued. See **Exhibit X**.

67.    In early May, to the astonishment of a member of McGuireWoods' healthcare team, Huron nearly missed the OMC medical malpractice insurance renewals. See **Exhibit Y**.

68.    As late as mid-May 2019, while working on the DOJ Letter with Mr. Daileader, Huron still did not know which OMC entities were operational. See **Exhibit Z**.

69.     After firing Dr. McCollum in early summer 2019, Huron neglected to remove him from the bank accounts and he absconded with $23,000. See **Exhibit AA**.

70.     During the wind down and liquidation process in August 2019, after having complete financial and operational control of OMC for nine months, Huron was incapable of giving their attorneys clear information about OMC's structure and employee interchange. See **Exhibit BB**.

71.     A clear understanding of the corporate structure is a necessary component of legally proper Worker Adjustment and Retraining Notification (WARN) Notices (the "Notices"). Instead, Huron ostensibly invented a corporate structure in order to have available providers execute the Notices to clinic employees. See **Exhibit CC**.

72.     For the Notices Huron was able to provide, they failed to meet the required 60-day pre-closing notice period because they were not willing to budge from the arbitrary timeline that they set for themselves, which was based in whole on how much money was left for them to be paid for their services.

73.     Mr. Daileader and Huron permanently laid off just under 300 individuals in South Carolina alone, yet their actions showed no concern for anything other than making sure their fees were paid in full.

**I.     Additional Fidus Loans**

74.     By January 2019, OMC had paid at least $1.8 million for professional fees, default interest (as a result of Lender-directed expenditures), and Lender withdrawals, and owed an additional $1.2 million for professional fees, interest, and Lender withdrawals.

75.     Because of these expenditures, OMC had to borrow an additional $400,000 from the Lenders to make its November 2018 interest payment and could not make its December 2018 and January 2019 interest payments.

76.     Throughout this entire time period, Dr. McCollum, his personal lawyer Grady Jordan, and OMC management consistently expressed their concerns to Mr. Daileader and Huron that the professional fees were excessively high and unnecessary, that OMC was too small of a business to afford them, and that OMC could not financially sustain the expenses.[11]

77.     In the DOJ Letter, Mr. Daileader characterized the cause of the necessity for the $400,000 loan somewhat differently: Mr. Kibbey, with assistance of other Huron personnel, believed that "the enterprise would suffer a cash shortfall near the end of calendar year 2018, and would require additional financing due to declining financial performance and prior deferrals of substantial accounts payable."

78.     Despite these financial issues, at the direction of Mr. Daileader, fifty (50) attorneys from McGuireWoods billed OMC during its engagement as lead counsel. The billing was excessive, yet Mr. Daileader never questioned it. In one email on July 23, 2018, Mr. Daileader wrote: "Cost is not an excuse given the size of the deal, and as I said to you, the investment in [McGuireWoods'] professional service will more than adequately protect the price of the deal." See **Exhibit DD**. The facts of this case directly dispute Mr. Daileader's "more than adequately protect the price of the deal" prediction.

79.     On March 11, 2019, the Lenders advanced an additional $3.5 million of revolving credit to OMC, the agreement for which included, much like earlier amendments to the loan agreement, covenants establishing milestone dates by which the consolidated group of entities were required to undertake restructuring transactions (including implementing the MSO structure) and a post-restructuring business plan subject to the approval of the Lenders.

---

[11] The unaudited OMC financials for the 2018 fiscal year were as follows: Net revenue of $43,631,069; net income of ($4,022,508); total assets, excluding goodwill, of $9,305,459; and total liabilities of $32,720,085.

80.     On April 30, 2019, the Lenders advanced an additional $1.5 million of revolving credit.

81.     Moreover, according to the DOJ Letter, "[f]urther funding of approximately $3.3 million [was] projected to be required to support going concern operations of the enterprise through mid-October 2019."

82.     Included in this request was funding for a new, $30,000 per month consultant named Roger Yapp. Mr. Yapp was engaged, according to his agreement, to provide non-clinical employee hiring, training, budgeting and scheduling; to manage and review internal contracts; to oversee and assist quality initiatives, including billing and collections; and to review all internal policies and procedures to ensure compliance with regulatory requirements. See **Exhibit EE**.

83.     Mr. Yapp's resume indicated that his experience was in driving revenue through sales, and Mr. Daileader and Huron believed he could conduct a clinic operational review. It is still unclear why Mr. Daileader and Huron, despite utilizing approximately 20 Huron professionals at one time or another during their tenure, felt the need to add an additional consultant.

84.     Nevertheless, once they realized that Mr. Yapp was not effective, after having paid him for over two months of work, they decided to terminate him.

85.     In hindsight, Mr. Kibbey determined what could have been learned through proper vetting on the front end: Mr. Yapp was not an industry expert, he lacked the professional experience needed to add value, and his engagement resulted in *more* wasted time and a failure of a clinic operational assessment. See **Exhibit FF**.

86.     In short, Mr. Yapp was paid approximately $70,000 to accomplish nothing and more time was wasted.

**J.      Still No MSO or Restructuring Plan**

87.     Regarding the MSO, Mr. Daileader wrote in the DOJ Letter (and again, this is from May 16, 2019, after Mr. Daileader had been the Independent Director for ten months): "Pursuant to the terms of the company's senior secured credit facility, originally dated May 6, 2014, OMCPC was to have put into place a corporate practice of medicine compliant management services organization ('MSO'). We understand that the intention of the existing corporate structure was for Oaktree Medical Centre, LLC to serve as the MSO. As of this time, however, the MSO structure has not been fully implemented."

88.     An MSO *proposal* was not issued until June 20, 2019, and in late June Huron healthcare practice team members were brought in for the first time to assess current provider documentation and outpatient coding to determine the potential benefit of implementation of a Clinical Documentation Improvement program, as well as to review OMC's medical billing process and compliance.

89.     Mr. Daileader and Huron knew that the team they had in place for eight months was not sufficient to conduct the necessary healthcare analyses.

90.     Mr. Daileader tried to explain why the MSO was never implemented or brought into compliance in his Rule 2004 Exam, conducted on August 19, 2020:

> Q. Okay. Did – Oaktree LLC and Oaktree PC, were they a fully compliant and effective MSO?
> A. No, they were not.
> Q. Was Huron able to fix that?
> A. No.
> Q. So why was that not able to be achieved?
> A. It's a significant undertaking, and it's a significant expense to put that structure into place, and, again, it would require the consent of all of the entities that were involved, including some entities that it – it was a very complicated restructuring that involved closing down certain entities; separating from certain entities; and transfers of different assets, including the identification of where assets were owned and then making those transfers. One of the issues that we

encountered in looking at the books and records was that the management – the existing management did not designate where certain assets were owned within the broader group. And, in fact, when we went and compared the transaction documents where they had acquired those, we saw that there was no designation made to, you know, the certain books and records of different entities. So we went back to Elliott Davis and actually asked for their help in identifying who owned these assets, and to the extent they were at the correct entity, that was fine; and to the extent they were at the incorrect entity, we would need to effect those transfers. Elliott Davis was not able to answer that, so there was an ongoing investigation to try to resolve those issues.

Q. And what ultimately happened? Why did that investigation stop?

A. Well, eventually the company – eventually we put in front of the lenders a full reorganizational plan, and 30-plus days after we put the lenders – the organizational plan in front of the lenders, the lenders declared to us that they were not going to fund the organizational plan, and the company then changed strategy to pursue either the sale of the company, as I described before, or a liquidation – a wind-down and a liquidation.

Q. When did you present that plan to the lender?

A. Around the third week of June 2019.

91.     With regard to the actual restructuring, Mr. Daileader wrote in the DOJ Letter that "the Oaktree Medical family of entities is in the process of finalizing details relating to a comprehensive corporate restructuring. Likewise, with input from the Chief Restructuring Officer and myself, an operational restructuring of the businesses comprising the Oaktree Medical family of entities is also in process."

92.     He continued: "The implementation of the aforementioned steps takes time, and any positive financial impact of these steps likewise is expected to take a substantial period of time to be recognized by the Oaktree Medical family of entities. The ultimate goal of these steps is to create a new, fully compliant and profitable provider of important healthcare services in the states of North Carolina and South Carolina and Tennessee."

93.     Both of Mr. Daileader's statements are essentially admissions that his team had not accomplished anything, but that was only because implementation of a compliant MSO and restructuring plan was too difficult.

94.     As late as July 2019, Mr. Daileader and Huron were still attempting to complete a financial projection and business plan that would support a restructuring proposal, but they needed more money from the Lenders to do so in order to pay themselves and McGuireWoods *and* expand their team. Actual *implementation* of the plan was presumably a long way off.

95.     At many points along the way McGuireWoods and Huron threatened to go "pencils down" if their professional fees were not paid, and, likewise, they often used filing for bankruptcy as an imminent threat to the Lenders.

96.     Upon information and belief, what Mr. Daileader and Huron did not know at this point, however, was that they had no more leverage against the Lenders. The Lenders had already written the loan down to zero in the second quarter of 2019. The Lenders were prepared to let OMC fail while they pursued Dr. McCollum's Guaranties and collateral, which had more value by this time.[12]

97.     In July 2019, the Lenders sued Dr. McCollum on his Guaranties. In August 2019, Mr. Daileader and Huron learned that the Lenders had written the OMC debt off their books earlier that year.

## K.     Final Demand of the Lenders

98.     In early July 2019, Mr. Daileader was demanding $1 million from the Lenders.

---

[12] The Lenders received, on average, 15% interest over the course of 4 years, a substantial portion of what they were owed were fees, and Dr. McCollum had personal collateral that he had pledged with his Guaranties that could pay back a large portion of the principal.

99.     Ironically, Mr. Daileader used legal compliance as a reason why either he and his team needed to be paid or Chapter 7 bankruptcy would be filed. He even went so far as to write in an email: "My obligations under state law impart a duty of care, and legal compliance is squarely within the four corners of care as defined by South Carolina state law." See **Exhibit GG**.

100.     Why Mr. Daileader and his team were still working on legal compliance a year into their tenure is anyone's guess, but once again it was pay us or pencils down. Mr. Daileader again: "The Lender doesn't understand Ch[apter] 7 and the ramifications for it of a trustee." See **Exhibit HH**.

101.     By mid-July 2019, the Lenders had approved the additional $1 million loan to effectuate the restructuring that had been allegedly ongoing for the previous eight months.

102.     However, Mr. Daileader, Huron, and McGuireWoods did a sudden change of course and said it had to be a Chapter 11, which, according to their analysis, required almost $5 million more in funding.

103.     In their outline for the Lenders, they noted that a Chapter 11 provides the "independent director and professionals to the OMC companies releases and exculpations that they believe are necessary to protect them in undertaking a corporate and financing restructuring and will not occur in the absence of such protections." See **Exhibit II**.

104.     Notably, Mr. Daileader and his team finally realized the effect of their professional fees, after billing for nearly one year.[13] Mr. Daileader wrote: "An additional result

---

[13] OMC paid, at a minimum, $4,128,609.13 in professional fees to Mr. Daileader, Huron, and McGuireWoods during the term of Mr. Daileader's engagement (Daileader = $189,851.19; HTA = $250,000.00; Huron = $2,160,120.86; McGuireWoods = $1,458,637.08; Roger Yapp = $70,000). The total spent on all consulting and outside services during the period from July 2018 to August 2019 was approximately $9,500,000.00, or $678,571 per month. By way of comparison, the total OMC paid on all consulting and outside services during the six months prior to Mr. Daileader's placement (January 1, 2018 through June 30, 2018) was $919,315, or 153,219 per month.

of this process is the further avoidance of professional fees, including the $300-400k monthly currently accruing, replacing these professionals with permanent management." See **Exhibit JJ**.

105.    One final time the team went pencils down while they waited, and the unsecured debt continued to balloon.

106.    Once the Lenders declined to increase their commitment, Chapter 7 preparations were in full swing.

**L.    Liquidation and Crossing the Rubicon**

107.    The liquidation process under Huron's control was a forced fire sale under arbitrarily severe time constraints based solely on how much money was available to pay professional fees.

108.    Mr. Daileader and Mr. Freedlander were so unconcerned about OMC's insolvency and the harm it was causing the unsecured creditors that they remarked that the Huron team was doing a good job liquidating assets and that they "should be liquidators." See **Exhibit KK**.

109.    Clearly, Mr. Daileader and Mr. Freedlander were not paying much attention. Mr. Kibbey testified about the liquidation of Labsource, the only profitable entity, in his 2004 Exam:

> Q. Why was Labsource not sold as a going concern?
> A. Well, it was not going to be a going concern without the clinics.
> Q. Why not?
> A. Over 60 percent of its revenue came from the clinics, and the margins on that revenue were significantly higher than the margins on the revenue that came from external sources.
>
> Q. What efforts were made to value the assets of Labsource, if any?
> A. What efforts were made to value the Labsource assets?
> Q. Yes.
> A. By whom?
> Q. An appraiser, somebody who knows what they're worth.

A. So we sought fair market value assessments from employees who were involved in purchasing and selling the equipment used in the labs on a regular basis. We also sought advice from equipment brokers in the market – multiple equipment brokers in the market to get a better sense of fair market value under the current market conditions at the time.

110.    As part of the liquidation, Mr. Kibbey and his Huron team made no effort to sell Labsource as a going concern, despite the forty percent (40%) of its revenue coming from third-party tests. They did not obtain or even attempt to obtain a true market value of OMC's only profitable asset. They did not bother obtaining an appraisal of the equipment which they did receive some, albeit inadequate, compensation for.[14]

111.    Astonishingly, the same competitor that was handed the Labsource operations for no consideration actually offered a percentage of revenue to Huron in exchange for Labsource's book of business. See **Exhibit LL**.

112.    However, payments over time would not benefit Huron; they were done with this job, so they declined. Finally, after nearly a year, time was money.[15]

113.    On Mr. Daileader and Huron's watch, OMC total assets fell from approximately $11.8 million on July 1, 2018 to approximately $6.8 million on August 1, 2019.[16] Total liabilities increased from approximately $27 million to approximately $39 million during the same period.

---

[14] They did not even have an up-to-date asset list, so it is anyone's guess where all of the equipment ended up.

[15] The OMC financials as of August 31, 2019 were as follows: Year to date net revenue of $21,204,757; year to date net income of ($9,016,020); total assets, excluding goodwill, of $6,809,711; and total liabilities of $39,176,823.

[16] This number fell to zero for unsecured creditors less than seven weeks later, at the time of the Chapter 7 filing.



114.    On September 18, 2019, the day before Chapter 7 was filed, Mr. Daileader sent an

email to Mr. Kibbey and Mr. Freedlander, which he titled "*Crossing the Rubicon?*" See **Exhibit MM**.

115.    Mr. Daileader wanted to know if the Chapter 7 Petitions had been filed. Mr.

Freedlander informed him that they were just waiting on the wires that would compensate Huron and

McGuireWoods for their final invoices. See **Exhibit NN**.

116.    Later that day the wires were sent ($148,734 to Huron and $61,620 to

McGuireWoods).

117.    Despite this, Mr. Daileader disputed that the two entities were paid in full in his

2004 Exam testimony:

> Q. Would it surprise you to learn that Huron and McGuireWoods were
> paid in full the day before the Chapter 7 was filed?
> A. I don't believe – I'd be surprised, because I don't actually believe

it's true.

118.   Perhaps Mr. Daileader had forgotten that Huron had contractually agreed to cap their fees and were paid in full for those fees. See **Exhibit OO**.

119.   Despite this, Huron had the audacity to file a Proof of Claim within the Debtors' Estates for the time they spent *over* the cap, *and* demanded and received a retainer for post-petition work.

120.   By September 15, 2019, Mark Freedlander and McGuireWoods were already moving on to the next liquidation where they would be "stepping into an existing situation where nobody can blame us for the mess and we can only stand to get credit for making it a [*sic*] drop better." See **Exhibit PP**.

121.   On September 19, 2019, Chapter 7 Petitions were filed on the authorization and order of Mr. Daileader and Huron. Whether intentional or not, it is notable that Mr. Daileader used a phrase "crossing the Rubicon," which means, in modern parlance, that they were irrevocably committing themselves to a risky course of action.

## FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty as to All Defendants

122.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

123.   Defendants were to discharge their duties as corporate officers and/or directors in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that they reasonably believed to be in the best interest of the corporation and its shareholders. S.C. Code Ann. § 33-8-420.

124.   Under South Carolina law, officers and:

> directors of a corporation owe the same fiduciary duties to creditors when the corporation is insolvent that directors owe shareholders when the corporation

is solvent. This conclusion is in accord with mandatory authority from the Fourth Circuit interpreting South Carolina law on the matter. *See FDIC v. Sea Pines Co.,* 692 F.2d 973, 976–77 (4th Cir.1982) ( "[W]hen the corporation becomes insolvent, the fiduciary duty of the directors shifts from the stockholders to the creditors."); *see also Davis v. Woolf,* 147 F.2d 629, 633 (4th Cir.1945) (quoting *Arnold v. Knapp,* 75 W.Va. 804, 84 S.E. 895, 899 (1915)) ("[W]hen a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors....") (applying West Virginia law).

*PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 126 F. Supp. 3d 611, 621 (D.S.C. 2015), <u>dismissed sub</u>

<u>nom</u>. *PCS Nitrogen Inc. v. Ross Dev. Corp. Rivers*, No. 16-1540 (L), 2018 WL 2111081 (4th Cir.

Mar. 19, 2018) (recognizing cause of action accruing to creditors under common law for breach

of fiduciary duty when corporation becomes insolvent). See also *In re Joseph Walker & Co.,*

*Inc.*, 545 B.R. 132 (Bankr. D.S.C. 2015).

125.    Additionally:

> Part of this obligation to creditors requires the directors to act as "trustees" for creditors, and to refrain from transferring assets of the corporation to themselves or preferred creditors. When there is a question as to whether a director has fulfilled his fiduciary obligations to creditors, the issues of the director's reasonableness and good faith are irrelevant, as is the severity of the breach; the *only* issue is whether there has been a breach at all.

*In re BHB Enterprises, LLC*, No. ADV. 97-80227-W, 1998 WL 2016846, at *13 (Bankr. D.S.C.

Sept. 30, 1998) (citations omitted). In *BHB Enterprises*, the Court found that the trustee was

entitled to judgment "for the difference needed to pay valid unsecured creditors in full." *Id.* at

*14.

126.    Mr. Daileader and Huron had a fundamental misconception of their fiduciary

duties. Mr. Daileader testified at his 2004 Exam as follows:

> Q. Who was your duty of loyalty and care to in the Oaktree matter?
> A. As I understood it, it was to the companies I was – I was a director or manager of.

127.    Mr. Kibbey testified at his 2004 Exam as follows:

Q. You testified earlier that your duty of loyalty and care was to the company. Did that ever change during the course of your assignment?

A. I don't know. Are you asking that question in terms of did it formally change? Are you asking in terms of my mindset? Are you asking in terms of what others told me to do? I'm not sure I understand the question.

Q No. I'm asking in terms of your fiduciary duty.

A. My fiduciary duty was to the company.

Q. Tell me the difference between a critical and non-critical vendor.

A. Well, with respect to the wind-down, those vendors that you need to execute your wind-down as smoothly as you can, given the time you have. …

Q. I'm assuming critical vendors were paid before non-critical vendors?

A. In most instances, I would – yeah, that's a fair statement.

128.     OMC was insolvent prior to the Defendants' involvement. At the 341 Meeting for

these matters, Mr. Kibbey testified as follows:

Q. When did Oaktree PC become insolvent, to your knowledge?

A. Well I – you know, I mean [inaudible] the zone of insolvency, I – if you look at the liabilities that that entity had and you look at the Qui Tam complaints and then certainly after the Department of Justice's decision to intervene in early March, and you tally up the liabilities – I'm not sure it was ever – I don't think it was solvent when we showed up last November.

Q. When did the transition go from your restructuring efforts and the sales efforts of the company to either filing a Chapter 11 or Chapter 7?

A. Well, there was certainly no talk of filing a Chapter 7 until much later in the process but to your question I think as we had more – we being myself, Mr. Daileader, Mr. Freedlander from McGuireWoods and the Department of Justice representatives – when we had more discussions with them subsequent to their complaint intervention, it became clearer I think from our perspective that probably the best way to basically to preserve the assets and, and to ensure you had a going concern post a settlement agreement with the Department of Justice was to do it through some sort of a Chapter 11. We certainly discussed a lot of other options with all the stakeholders but it kept coming back to really the – frankly and I'm not a bankruptcy lawyer obviously but from the lawyers' perspective, really the only way to, to preserve those assets is gonna be through a Chapter 11. But that was much later than, certainly than November of 2018.

Q. I think you testified earlier that when you first got involved, do you think it's, it's possible that Oaktree had already become insolvent? Is that accurate?

A. Correct. You can make an argument that company had been insolvent for years.

129.    In Mr. Daileader's 2004 Exam, he testified:

Q. Okay. What was Huron Business Advisory's first – what were Huron Business Advisory's first priorities?

A. Generally speaking, it's to take a look at the company's cash flows and to make sure that the company is, you know, maintaining adequate cash flow to maintain its business.

Q. Was it?

A. Yes. It would require one of the – the objective of that would be that the company had sufficient funds to go forward. We would require additional funding from the lender in certain instances.

130.    Additionally, the following are excerpts from Mr. Kibbey's 2004 Exam:

Q. I want you in your professional experience as a chief restructuring officer to tell me as of the date you stepped in as CRO, was Oaktree solvent or insolvent.

A. I don't know.

Q. So at what point in time prior to September 19, 2019 were you able to come to that conclusion, if ever?

A. I never came to a conclusion regarding solvency.

Q. Do you have any opinion as to whether or not this company that you were CRO of for 11 months – 10 months at any point in time was solvent or insolvent? That's not a determination you made?

A. It was not in our scope, and it was not applicable to what we were trying to do, which is restructure a company and turn it around and find the best potential transaction to – you know, to end the restructuring, whether it's through a sale or whether it was through a reorganization in or out of court.

A. Correct, I – you can make an argument – you can make an argument that the company had been insolvent for years.

Q. Do you dispute that testimony?

A. I would say that it depends on the definition of insolvency. I should have asked the male speaker what the definition of insolvency was.

Q. Under what definition had Oaktree been insolvent for years when you stepped in?

A. Under what definition?

Q. You said it depends on the definition. I'm wondering what definition it depends on?

A. The inability to pay your debt.

131.    Mr. Kibbey has advanced qualifications in this area, including being a Certified

Insolvency and Restructuring Advisor. Yet, he was incapable of not only determining whether

the company he was an officer of for nearly a year was solvent, but also of providing even a

rudimentary definition of insolvency. Yet he did testify to the following:

> Q. I'm wondering if the debt increased when Oaktree paid Huron's
> fees or you were able to do enough cost-cutting initiatives to pay for
> it?
> A. We were not able to implement enough cost-cutting initiatives to
> even allow the company to consistently make payroll across all the –
> of the entities, and that fundamentally was the reason for the
> restructuring plan. When you add professional fees onto that, the only
> way you could fund that part of the restructuring was with additional
> cash infusion from an outside source. So that additional cash infusion
> went not only for professional fees but also for payroll so that you
> could keep employees working on restructuring and the day-to-day
> operations.

132.    If a company does not have the cash to pay its bills as they become due without

additional funding, it is cash-flow insolvent.

133.    Consequently, from the time the Defendants took over control of the Debtors,

they failed to discharge their duties as corporate officers and/or directors in good faith, with the

care an ordinarily prudent person in a like position would exercise under similar circumstances,

and in a manner that they reasonably believed to be in the best interest of the unsecured creditors.

134.    Corporate officers and directors are individually liable for the tortious conduct of

the corporation when "they commit, participate in, direct, or authorize the commission of a

tort." *Plowman v. Bagnal*, 316 S.C. 283, 286, 450 S.E.2d 36, 37–38 (1994), *adhered to on*

*reh'g* (Oct. 19, 1994). See also *Hunt v. Rabon,* 275 S.C. 475, 272 S.E.2d 643 (1980).

135.    Mr. Daileader, Mr. Kibbey, and Huron willfully directed the breach of their

fiduciary duties and are thus personally liable.

136.    McGuireWoods owed professional duties initially to the Debtor but soon after their engagement knew or should have known of the Debtor's insolvency and at that point they owed a fiduciary duty to the creditors and to the Debtor to advise its officers and managers that in light of the Debtor's insolvency their duties had shifted to the Debtor's creditors. McGuireWoods were to adequately, timely and competently counsel, plan, advise, prepare and to be a good steward of Estate funds and assets to the benefit and in the interest of the Debtor's creditors.

137.    However, McGuireWoods failed to properly advise Mr. Daileader, Mr. Kibbey, and Huron to the detriment of the creditors and the Estate.

138.    As a result of the foregoing, Plaintiff, on behalf of the Debtor and/or Debtor's creditors, is entitled to recover damages proximately caused by all of the Defendants' breaches of their duty of care, including all amounts needed to pay valid unsecured creditors in full.

## SECOND CAUSE OF ACTION
**Aiding and Abetting a Breach of Fiduciary Duty as to Huron**

139.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

140.    As laid out above, upon information and belief, all of the Defendants breached their fiduciary duties to the  creditors.

141.    However, if it is determined that only Mr. Daileader and Mr. Kibbey, individually and in their capacities as a director and an officer of the Debtors, held the fiduciary duty, Huron, Mark Freedlander, and McGuireWoods knowingly and willingly participated in Mr. Daileader and Mr. Kibbey's breaches as alleged in the First Cause of Action herein.

142.    There is not much that sums up the attitude that these professionals had with regard to their duties and responsibilities more than a colorful July 26, 2019 email from Mr.

Freedlander to Mr. Daileader, with regard to the Lenders: "F**k these guys. Let's kill this and move on. We all have other and better things to do. This is just a game to these fools and not worth the effort." See **Exhibit QQ**.

143.    As a proximate result of Huron aiding and abetting Mr. Daileader and Mr. Kibbey in the breach of their fiduciary duties, the Estate and Plaintiff, on behalf of the creditors, have been damaged.

### THIRD CAUSE OF ACTION
**Negligence/Gross Negligence as to All Defendants and Lawyers' Professional Malpractice**

144.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

145.    Defendants owed a duty to Debtor's creditors to, at a minimum, be cognizant of the fact that they owed the  creditors a duty of care and loyalty due to the Debtors' insolvency.

146.    The Defendants stepped into a business with declining operating margins, rapidly increasing debt, and an unnecessarily complex organizational structure with an improperly implemented and non-compliant MSO, in an industry (opioids) rife with increasing negative societal issues.

147.    Upon information and belief, Mr. Daileader and Huron were incapable of analyzing and/or refused to analyze how these clear and present internal and external threats would affect OMC, and by extension the creditors, especially after the DOJ raids, as their actions demonstrated that payment of their own fees was their primary objective.

148.    If there was not a realistic path to restructure, a shutdown would have prevented throwing good money after bad (and increasing the unsecured debt). Companies with little or no chance of survival are required by law to be operated to maximize returns for all creditors.

149.    If there was a path to restructure, and clearly Mr. Daileader's team thought and communicated that there was, their first step in the careful and prudent discharge of their duties would have been to ascertain whether restructuring was possible and, if so, second, to develop a restructuring strategy, and third, to implement that strategy, all of which they failed to do, constituting negligence and gross negligence which caused damage to the Estate, including the creditors.

150.    In developing a strategy, a good CRO determines whether the firm is in distress because the existing strategy is flawed, good but poorly implemented, or poor and poorly implemented.

151.    A revised corporate strategy would have eliminated extraneous business units (i.e., clinics) by exiting unprofitable service markets in order to concentrate solely on the success of a defined core.

152.    Moreover, a good CRO has the ability to foresee disruptive events that may permanently change the landscape and calculate the consequences of such events. Inability to do so can set the stage for failure.

153.    Yet, Mr. Daileader and Huron did not even bother determining the value of OMC after the DOJ raids. Mr. Daileader testified at his 2004 Exam as follows:

> Q. How did you value a settlement with the DOJ with regard to the value of Oaktree as to prospective buyers.
> A. I don't know that I couldn't – I could answer that question because I knew nothing about what had been claimed. I have been involved in a qui tam settlement before that – which settled for zero, and it was on national headlines, so the simple answer to your question is, no, I didn't know how to value it.

154.    Mr. Kibbey testified at his 2004 Exam as follows:

> Q. Did you ever value a settlement with the Department of Justice?
> A. I don't understand the question.

> Q. Did you ever analyze what it would cost to settle with the Department of Justice and use that in your financial analysis of the company's solvency.
> A. Again, we didn't do any solvency analysis.

155.    Despite that, it may have been less Mr. Daileader and Huron's failure to develop a clear strategy that incorporated the issues raised by the effect of the USDOJ raids, and more a lack of internal discipline that caused OMC's downfall.

156.    The minute Mr. Daileader, Huron, and McGuireWoods opted not to file Chapter 11 at the outset, they should have made changes, but instead they made enemies.

157.    While a typical CRO should set up clear lines of authority and responsibility, Mr. Kibbey and his team only caused strife and confusion. Even though Mr. Daileader determined early on that prior management was the root of the Debtors' problems, neither he nor Huron acted to terminate any of the prior management until March 2019, and allowed these individuals to collectively earn at least $790,000 from their continued employment with the Debtors.

158.    In most restructuring cases, discharging the current ineffective and disruptive managers is the first step. Furthermore, a good CRO needs to know the business. Mr. Kibbey did not, and even after working in the industry for a year, based on his testimony, he did not learn anything.

159.    What Mr. Daileader and Huron could and should have done is set up restructuring procedures in order to determine which clinics were profitable, close the ones that weren't, and then try to do a workout, attempt to sell the business, or file Chapter 11 Bankruptcy.

160.    A Chapter 11 sale likely would have made the most sense because of OMC's leases and contracts. Since all three Debtors had multiple executory contracts and leases with various pain management clinics and individuals, those leases and other executory contracts

contributed to fixed costs[17] of the entities throughout Huron's engagement. *See* Exhibit RR, *infra*.

161.    Huron did not have the same ability that a Chapter 11 trustee would have had to assume or reject unexpired executory contracts and leases. The inability to cancel these executory contracts and leases severely limited Huron's ability to downsize or restructure the businesses.

162.    Instead, Mr. Daileader and Huron flip-flopped with how to handle the Debtors during their engagements without ever settling on a specific strategy that was in the best interests of OMC and included all of the creditors.

163.    Mr. Daileader wrote in the DOJ Letter: "[I]t became clear to Huron and the Independent Director that the deficiencies in accounting and financial controls for the enterprise and the existence of long-standing defaults under the Investment Agreement rendered the successful completion of an audit all but impossible. Additionally, corporate legal documentation was absent in certain cases, and in others did not align with the financial recordkeeping. Furthermore, forecasting was, at best, informal, inaccurate, and incorrect. The poor and irreconcilable documentation and recordkeeping raised compliance concerns, and alongside the negative operating performance, it became evident that the business required a comprehensive corporate, financial, and operational restructuring plan."

164.    Professional management firms like Huron are engaged for the very purpose of parsing through fact and fiction from existing management.

---

[17] Fixed costs are costs that continue to accrue even if the companies do not see a single patient at the clinics or perform any tests at Labsource. Variable costs are any costs accrued by medical staff during normal in-office medical procedures or costs that fluctuate based on the volume of patients seen and labs processed.

165.     Mr. Kibbey testified that his initial assessment was that of confusion and that he was not sure if Huron had accurate numbers. That should have been the very time to stop and get the cash flow issues resolved.

166.     The problem was, Huron put an inexperienced CRO with no understanding of the industry into a position he had no chance of performing effectively in, and Mr. Daileader supported the decision.

167.     Mr. Kibbey ran Huron's New York office. Huron is one of the world's largest publicly traded consulting firms. Yet, Mr. Kibbey fumbled over the most basic elements of his own employer's corporate structure. These are excerpts from his 2004 Exam testimony:

> Q. Does Huron have subsidiaries?
> A. No.

> Later in the 2004 Exam:

> Q. My understanding is that there's a Huron Transaction Advisory, LLC and a Huron Business Advisory, LLC. Are you familiar with those?
> A. I'm familiar with those two entities, yes.
> Q. Are they wholly owned subsidiaries of Huron?
> A. To the best of my knowledge, I think so.

168.     Huron finally prepared a Business Case in Support of a Pre-Arranged Chapter 11, dated July 22, 2019, which outlined a plan and the cost of a Chapter 11 filing ($3 million, less $1.2 million that would be paid to Huron regardless of filing).

169.     October or November of 2018, or earlier, was the time frame to consider a Chapter 11 filing. It was far too late in July 2019. In September 2018, OMC had as much as $2 million in cash in the bank and Lenders willing to lend in order to get out of the hole they were in. Once the professional fees began, however, the $2 million was depleted and the interest payments to the Lenders stopped.

170.   Huron has stated that during their assignment the Chapter 11 option was too expensive considering the financial constraints of the companies. However, the professional fees incurred under Huron's watch exceeded any reasonable Chapter 11 fees that would have accrued for the three Debtors had the petitions been filed in November 2018, or earlier, rather than proposed in July 2019.

171.   A competent CRO should have drawn the conclusion early in his involvement that there was no reasonable workout available outside of a Chapter 11 Bankruptcy. Time is of the essence in a distressed situation and the CRO is required to act decisively and quickly. Stagnation and indecision only accelerate the crisis.  But yet, Mr. Kibbey testified in his 2004 Exam:

> Q. Why was a Chapter 11 bankruptcy not contemplated in November 2018?
> A. I don't – I did not know enough to make a recommendation, at least, like I think I said earlier, you can always make recommendations – make a thoughtful recommendation as to what the course should be, whether it should be a Chapter 11 or Chapter 7 or an out-of-work. We did not know enough to make an intelligent professional recommendation at that point.
> Q. Was time of the essence in the Oaktree engagement?
> A. When?
> Q. The minute you stepped in.
> A. No.

172.   By that rational, time was not of the essence as long as you have money; if the source of that money stops loaning it, the result is the lender's fault. From Mr. Kibbey's 2004 Exam testimony:

> Q. Was Huron able to establish a fully compliant and effective MSO?
> A. I would answer that question a little differently. Huron doesn't have the ability to do that by itself.
> Q. With whatever partners you need, was it able to do so?
> A. Can you repeat the question?
> Q. Yes. Was Huron and the other professionals able to establish a fully compliant and effective MSO?
> A. There was a plan in place. The plan was never fully executed.

Q. Why not?
A. Well, because part of that plan involved filing for a Chapter 11 as part of the corporate restructuring, and we were not able to get the financing filed for a Chapter 11, and the lenders requested that not only we do not file for Chapter 11, but that we wind down the operations. So at that point there was – it didn't make any sense to put any more time or effort into trying to create an MSO client organization, just to wind it down.
Q. That was in the summer of 2019?
A. What is your question about?
Q. What you're talking about where the lenders asked you to wind it down and wouldn't fund the Chapter 11 and the client MSO, that was in the summer of 2019, right?
A. Correct.

173.  Mr. Daileader noted in his 2004 Exam testimony that "we produced a product, and we produced the opportunity for it to be restructured, and ultimately the lenders denied the funding."

174.  From Mr. Kibbey's 2004 Exam again:

Q. Did you ever come up with a strategy?
A. A strategy for what?
Q. For whatever it was you were supposed to do at Oaktree.
A. I don't know if I can answer that question. What I can say is over the course of the engagement we developed a restructuring plan and with a budget and with a timeline and were in the process of executing that plan.

175.  Upon information and belief, Mr. Daileader and Huron did not accomplish much at all. It was all correspondence, talk, and spreadsheets.

176.  By mid-January, they were still discussing simply *getting together* to develop a comprehensive game plan for an overall restructuring.[18]

177.  Mr. Kibbey spent so much time trying to collect $60,000 from a Tennessee Court resulting from an excess on a bank levy against OMC due to failure to pay on a lease agreement

---

[18] A restructuring *proposal* was not presented until May 20, 2019.

(hundreds of emails over eight months and the hiring of local Tennessee counsel), that by the end

of March Mr. Freedlander remarked that they'd spent $25k "dicking around" over $60k.

178.     Huron spent an embarrassing amount of time reviewing historical OMC

management emails, which was a "top priority" according to Mr. Freedlander.

179.     When questioned about reviewing emails in the 2004 Exam, Mr. Kibbey's

testified:

> Q. So in your professional opinion, reviewing employee emails was
> important in this matter?
> A. In this matter it proved to be critical. You wanted to understand the
> real truth and the real situation. Absolutely.
> Q. It was critical in what sense?
> A. To understand the situation, you had to – you had to know what
> was really happening behind the scenes.

180.     However, understanding the situation was never achievable according to Mr.

Kibbey:

> Q. So it sounds to me like you're talking about initially in November
> you're trying to understand the situation.
> A. No, that's not correct.
> Q. When did you stop trying to understand the situation? At what point
> in time?
> A. I'm not sure we ever stopped trying to understand the situation.

181.     During his 2004 Exam, when Mr. Kibbey was asked what he thought they did

accomplish, he testified as follows:

> Q. What measurable restructuring initiatives did you achieve during
> your engagement?
> A. I'm not sure what you're getting at. What I will – so maybe I'm not
> answering the question right. If I'm not, let me know. So the liability
> based on the proposed settlement with the Department of Justice that
> we later learned of that was on the table when we were engaged was
> 30 to $40 million. So as part of our discussions with the Department of
> Justice, that proposed settlement went down to 1 to 5 million. So the
> savings there are anywhere from 35 to – or I guess if you start at 30
> million, right, it could be 25 to 39 million of savings just through that
> liability alone.

182.    The first and only measurable restructuring initiative they achieved, according to the CRO, was a potentially reduced settlement with the Department of Justice. Remarkably, Mr. Kibbey had already testified that McGuireWoods was leading those negotiations.

183.    Mr. Kibbey did ultimately admit that expedience was important in his 2004 Exam testimony:

> Q. At any point in time did you think that potentially the professional fees that Oaktree was paying could not be sustained?
> A. No. I think – I think in terms of a restructuring, I mean, that's often the case. A business isn't designed to pay professional fees for an indefinite length of time. And we never came to the conclusion that Oaktree could pay these fees for an indefinite length of time. It was how do you as quickly as you can effectuate a restructuring and transition the business and presumably the ownership.

184.    Mr. Daileader knew the MSO was not properly in place. Huron did not know what an MSO was. Mr. Daileader and Huron knew OMC was insolvent. They should have known that the only way to save the company was an expedient Chapter 11.

185.    Instead, Mr. Daileader and his team paid themselves handsomely with the Lenders' cash for a year, did nothing else except make promises they could not keep, balled the company up and threw it into Chapter 7, in an attempt to avoid liability.

186.    Plaintiff would show that Defendants negligently, recklessly, willfully, wantonly, and grossly negligently breached their duties to the unsecured creditors by, among other things, failing to:

a.    understand their role;

b.    develop a reasonable and actionable strategy;

c.    get all of the interested parties to agree to a well-reasoned strategy; and

d.    take timely and appropriate action in compliance with that role and strategy.

187.    As to McGuireWoods, Mark Freedlander, and David Pivnick, and in compliance with South Carolina Code Ann. § 15-36-100, the Affidavit of Michael M. Beal is attached hereto as **Exhibit RR**.

188.    At all relevant times, a client-lawyer relationship existed between the Debtor, on the one hand as client, and the Lawyers, on the other as professional attorneys.

189.    The scope of the Lawyers' representation of the Debtor was to provide legal services, counsel, advice, preparation, drafting, careful planning and review of ongoing facts and circumstances with a view toward providing benefit to those entities and individuals to whom the Lawyers owed a duty.

190.    The Lawyers owed professional duties initially to the Debtor but said professionals on cursory examination soon after their engagement knew or should have known of the Debtor's insolvency and at that point the Lawyers owed a duty to the creditors and to the Debtor to advise its officers and managers that in light of the Debtor's insolvency their duties had shifted to the Debtor's creditors, said duties of the Lawyers and other defendants were to adequately, timely and competently counsel, plan, advise, prepare and to be a good steward of Estate funds and assets to the benefit and in the interest of the Debtor's creditors.

191.    The Lawyers breached their professional duties to the Debtor and its creditors by failing to adequately, timely and competently provide legal services, counsel, advice, planning, and preparation with a view toward maximizing the value of the Debtor's assets and minimizing to the extent possible the expansion of future debt without realistic benefit to those to whom the Lawyers owed a duty of professional care.

192.    The Lawyers failed to meet the minimum standard of care thereby breaching professional duties to the Debtor and creditors in other ways and by such other particulars as the evidence developed during discovery in this case may demonstrate.

193.    As a direct and proximate result of Defendants' negligent, reckless, willful, wanton, and grossly negligent acts, omissions and/or delicts as enumerated hereinabove, the Estate and Plaintiff, on behalf of the Debtor and creditors, was seriously damaged. Therefore, and in accordance with *Plowman*, supra, with respect to Mr. Daileader, Mr. Kibbey, and Huron, Plaintiff requests judgment against all Defendants for actual and punitive damages with interest thereon.

### FOURTH CAUSE OF ACTION
### Fraud as to Mr. Daileader and Mr. Kibbey

194.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

195.    Defendants Mr. Daileader and Mr. Kibbey, in their capacities as a director and officer of the Debtors, owed a duty to disclose to the Debtors that they did not have the requisite experience to both restructure a health care company and to do so in compliance with both federal and South Carolina law.

196.    They misled the Debtors into believing that they were capable of performing these services, while knowing that the representations were false or while recklessly disregarding the truth and falsity thereof and intending that the Debtors would rely upon these representations to utilize their services.

197.    These misrepresentations by Defendants were material to the Debtors' decision to utilize Defendants' services.

198.    As a proximate result of justifiably relying upon Mr. Daileader and Mr. Kibbey's misrepresentations, the Estate and Plaintiff, on behalf of the  creditors, were injured.

199.    Based upon the foregoing, the Plaintiff is entitled to judgment against Mr. Daileader and Mr. Kibbey and to an award of compensatory and punitive damages in an amount to be determined by the jury, with interest thereon.

**FIFTH CAUSE OF ACTION**
**Civil Conspiracy as to All Defendants**

200.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

201.    Defendants, by and between themselves, conspired to interfere with, delay, hinder, and/or prevent the Debtors' creditors from collecting debts the creditors were properly entitled to collect in order to pay the Defendants' own fees.

202.    As a proximate result of the Defendants' conspiracy against the Estate and Plaintiff, on behalf of the creditors, the Plaintiff has incurred damages.

203.    The Plaintiff is also entitled to an appropriate award of punitive damages due to the conspiracy undertaken by the Defendants.

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment as to Mr. Daileader, Huron, and McGuireWoods**

204.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

205.    Through their negligent acts as detailed herein, Defendants Mr. Daileader, as Independent Director, and Huron, for their own benefit, utilized the Debtors' profits to pay themselves.

206.    It would be unjust to the creditors to allow Defendants to retain those ill-gotten gains.

207.    Accordingly, as a result of the foregoing, Plaintiff is entitled to recover the damages proximately resulting from Defendants' actions, including the amount of all valid unsecured claims.

<b>SEVENTH CAUSE OF ACTION</b>
<b>Bankruptcy Code Section 548(a)(1)(A) (Actual Fraud) as to All Defendants</b>

208.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

209.    During their tenure in control of the Debtors, Defendants paid out over $4 million in professional fees to themselves and those they utilized to perpetrate their fraud (the "Transfers").

210.    The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

211.    Upon information and belief, the Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtors.

212.    Upon information and belief, such actual intent is evidenced by, among other things, a misrepresentation of their competence and experience, a fundamental misunderstanding to their duties, and putting paying their fees above the interests of any others.

213.    Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(A).

214.    Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

### EIGHTH CAUSE OF ACTION
**Bankruptcy Code Section 548(a)(1)(B) (Constructive Fraud) as to All Defendants**

215.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

216.    The Transfers, which were to or for the benefit of Defendants, occurred on or within two years before the Petition Date.

217.    Upon information and belief, the Defendants are the transferees of property of the Debtors.

218.    The Debtors received no or less than reasonably equivalent value in connection with the Transfers which were made to or for the benefit of Defendants, and which were transferred by the Debtors within two years before the Petition Date.

219.    At the time of the Transfers, the Debtors (i) were insolvent or became insolvent as a result thereof; (ii) were engaged in a business or transaction or was about to engage in a business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to incur or believed or reasonably should have believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

220.    Because of the foregoing, the Transfers may be avoided under Section 548(a)(1)(B) of the Bankruptcy Code, and the value of the Transfers may be recovered from the Defendants as the initial transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

221.    Plaintiff prays that this Court issue an order voiding the Transfers as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(B).

222.    Plaintiff further prays that this Court issue an order allowing the value of the Transfers to be recovered from the Defendants as the transferees or entities for whose benefit the Transfers were made under Section 550 of the Bankruptcy Code.

<u>NINTH CAUSE OF ACTION</u>
**Bankruptcy Code Section 547 (Preferences) as to All Defendants**

223.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

224.    The professional fees paid to the Defendants in the one year prior to the Petition Date were made to the Defendants for or on account of an antecedent debt by the Debtors to the Defendants and Plaintiff is informed and believes that the Transfers constitute avoidable preferences pursuant to 11 U.S.C. § 547 of the United States Bankruptcy Code.

225.    At the time of the Transfers, the Debtors were insolvent and Defendants were insiders.

226.    The payments referred to in the proceeding paragraphs enabled the Defendants to receive more than they would have received under Chapter 7 of the Bankruptcy Code if the Transfers had not been made.

227.    By reason of the forgoing, Defendants are liable to Plaintiff in the full amount of the professional fees paid to them.

<u>TENTH CAUSE OF ACTION</u>
**Bankruptcy Code Section 329 as to McGuireWoods (Unreasonable Compensation)**

228.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

229.    McGuireWoods was paid in excess of $1.4 million from August 2018 to September 2019. McGuireWoods was engaged to assist Oaktree in a financial restructuring which would be accomplished through a sale or refinancing.

230.   The Debtors failed in every respect in these endeavors and ultimately filed Chapter 7 with substantially more debt and substantially less assets than when McGuireWoods was initially engaged.

231.   The fees paid to McGuireWoods far exceeded the reasonable value of any such services.

232.   By reason of the forgoing, McGuireWoods is liable to Plaintiff in the full amount of the professional fees paid to it.

ELEVENTH CAUSE OF ACTION
**Bankruptcy Code Section 550 (Recovery of Avoided Transfers)**

233.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

234.   Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover the value of the property transferred for the benefit of the Estates to the extent the Transfers are avoided pursuant to, among other sections, Sections 329, 544, 547, and 548 of the Bankruptcy Code.

235.   Under Section 550(a)(1) of the Bankruptcy Code, Plaintiff may recover from the initial transferee of such transfer or the entity for whose benefit such transfer was made.

236.   The Defendants are the initial transferees or entities for whose benefit the Transfers were made.

237.   Plaintiff prays that the Court issue an order against the Defendants, ordering recovery by Plaintiff for the benefit of Debtors' Estates the value of the property transferred with respect to any transfers avoided under this Complaint pursuant to 11 U.S.C. § 550 to the extent the Defendants are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees.

### TWELFTH CAUSE OF ACTION
**Breach of Contract as to All Defendants**

238.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

239.    Defendants breached their contracts with the Debtor generally and as more specifically set forth herein and as a factual and proximate result the Debtors' separate and combined Estates were materially damaged.

240.    The damage to the Debtors' Estates as a result of the Defendants' breaches, upon information and belief, would exclude any right on their part to any payment sought through any proof of claim filed in this bankruptcy Estate.

241.    Plaintiff is informed and believes that it is entitled to have this Honorable Court adjudicate to conclusion the issues raised by the Parties or within the core of operative facts related to Defendants' contractual and professional duties to the Debtors or their creditors.

### PRAYER FOR RELIEF

Plaintiff respectfully requests and prays that this Court enter judgment in his favor and against Defendant, and award the following relief:

a.   An order granting actual, general, compensatory, incidental, and consequential damages in an amount to be determined at trial;

b.   An order granting exemplary and/or punitive damages for Defendants' willful, malicious, wanton, or reckless conduct;

c.   An order granting judgment for Plaintiff and voiding the Transfers from the Debtors to Defendants found to be fraudulent pursuant to 11 U.S.C. § 548, and/or preferences pursuant to 11 U.S.C. § 547, and pursuant to 11 U.S.C. § 550;

d.  An order granting judgment for Plaintiff and voiding the fees paid from the Debtors to Defendant McGuireWoods found to be unreasonable pursuant to 11 U.S.C. § 329;

e.  An order granting judgment for Plaintiff and ordering recovery of the value of the property transferred to the Defendants pursuant to 11 U.S.C. § 550 to the extent they are initial transferees or entities for whose benefit such transfers were made or are immediate or mediate transferees of such initial transferees;

f.  Pre-judgment interest;

g.  Post-judgment interest;

h.  An order awarding Plaintiff the costs of this suit; and

i.  For such other and further relief as this Court deems just and equitable.

j.  Full adjudication by this Honorable Court of the issues and facts presented by the Parties in the pleadings, proofs of claim, discovery, and any issues presented by the core of operative facts related to Defendants' performance of its duties to Debtors or those services which should have been performed.

(Signature page follows)

/s/Joshua J. Hudson
Joshua J. Hudson, Fed. ID No. 11620
Joseph O. Smith, Fed. ID No. 10551
jhudson@smithhudsonlaw.com
Smith Hudson Law, LLC
200 N. Main St., Suite 301-C
Greenville, SC 29601
(864) 908-3914

Warren C. Powell, Jr., Fed ID No. 3138
Benjamin C. Bruner, Fed ID No. 10625
Chelsea J. Clark, Fed ID No. 12730
Bruner Powell Wall & Mullins, LLC
PO Box 61110
Columbia, SC 29260
(803) 252-7693
*Attorneys for Trustee/Plaintiff*

Greenville, South Carolina
December 7, 2021